Good morning. May it please the Court, my name is Mary Pogalis. I represent the appellant Gary Adams. Would you mind just keeping your voice a little up? Up. All right. Is that better? That's better. There we go. All right. Speak right in the microphone, we can hear you better. This courtroom, I might add, I think was added to the Court in the 1930s, and it has the cork board, which you would think would make for better acoustics, but it doesn't always, so. It just soaks it all up, huh? Correct. Yes. Okay. All right. So my name is Mary Pogalis. I represent the appellant Gary Adams in this appeal. It's a pleasure to appear before the Court and have a chance to address this personally with you. Thank you for scheduling it for oral argument. I would like to reserve five minutes of my time for rebuttal, so I will make my opening remarks short. My main point here and the main point on this appeal is that we have a case where an innocent explanation of the evidence is as likely as the incriminating explanation. Because of that, under this Court's prior ruling in Vasquez Chan, these convictions must be reversed. Certainly a review of the transcript in this case would show that what we're dealing with here is pretty much an assembly-line, factory-style prosecution of a drug trafficker, at least someone the government thought was a drug trafficker. There are drugs, and certainly a significant quantity, found in the closet. There are suspicious circumstances that were presented to the jury. Officers were injured in the course of executing this warrant, and there was a suspect, Mr. Adams, who was involved in these offenses, who had prior convictions involving drug sales. With that on the table, the government was, obviously, as were the officers, completely satisfied that they had caught a drug trafficker and that Mr. Adams was responsible for all the drugs found in the closet. The problem with this conclusion and with the jury's adoption of it is that the evidence that supports it is quite skimpy. Yes, there were a lot of drugs, and that's certainly emotional and impressive. However, the bottom-line foundation of this prosecution is that Mr. Gary Adams lived in this apartment, had lived or had residence there anyway with his girlfriend. Well, let me just ask you, when you're talking about the evidence, if you could do it in the framework of the standard of review, because even if evidence is skimpy, since we're here under the – after a jury trial, we're looking at it in the light most favorable to the government and whether any rational trial of effect might have determined that given the volume of drugs, his residency there, you know, his coat in the closet and all the other things, whether any rational trial of effect might have found him guilty. So if you could kind of work that in, that would be helpful to us. All right. Well, right there is a problem. His coat in the closet, where is the evidence to support that? Yes, there was an ID card, a California ID card, not a driver's license, found five years after the fact in the pocket of a jacket. Well, we'll take that. It's sort of surprising, but what are we supposed to do with it? Well, here's the problem with that. In the evidence before the jury, the testimony of the officer who found this card is that that jacket, I think he was talking about the jacket, he went back and forth using the word jacket to describe both the trench coat and the jacket, but we'll assume he means the coat where the ID card was found. He described the custody, the chain of custody on that as being, it was kind of group custody, he said. He was not responsible for it. The government never presented any person. They did not establish an unbroken chain of custody for that evidence. Group custody, what is, group custody brings the entire thing into question. Certainly adequately to establish a reasonable doubt with its appearance so long after the fact, going through the hands of so many officers in what clearly was a somewhat chaotic situation there because of the brothers' behavior. What I'm asking in the standard of review what Mr. Adams asked this Court to do is to in fact look at all of the evidence, including the glaring gaps, the questions that weren't asked, the evidence that was not provided, certainly the evidence that was presented was adequate to arrest this man, it was adequate to indict him, but there are too many unanswered questions and there was too much that could have been done that was not done that raises the specter that the answers might have been different. For instance, Mr. Gary Adams waved Miranda promptly. He was never asked about those jackets. He was never asked if he had any ID or paperwork in the house. He was never asked to try on the jacket. He was never asked about the drugs in the closet. He said that his brother was going to take the rap for them, but there was no evidence that anyone asked him, were those your drugs? Yet he had waved Miranda. Why was he not asked? There is no solid evidence and there could have been a great deal of it. The officers never examined him for possible drugs. Are you suggesting that a Miranda waiver changes the calculus in terms of determining what the weight of the evidence is? No, I'm saying that the Miranda waiver allowed the officers and the prosecutor to provide a good deal, especially the officers, the waiver was right there pretty much at the scene and then again at the police station. I think that a reasonable jury has to consider these gaps, which is we have only circumstantial evidence. There was no direct evidence that these were his. The single link to that larger... His admissions aren't direct evidence? His admissions are, no, they're not direct evidence. In no way does he say those are my drugs, I had them to sell, you know, I knew they were there. He doesn't say any of the things that are the elements of the crime. He doesn't admit to possession of anything but the eight grams in his pocket. He doesn't admit to intent. At most he may admit to knowledge. But even as to that, he says, that it's his brother's. My brother is going to take the rap for those drugs. Now, certainly this might disclose knowledge of the existence of those, but all of the surrounding circumstances with the jury had to look at that there was almost no evidence of drug trafficking out of that apartment. That the expert said there was a, often drug dealers have a second stash apartment, which is where they keep their stuff to protect their home, to protect where they live. Well, he did have such a place, or what they alleged was such a place. There was nothing there. Did you want to save the remaining time? I will. Just over three minutes now. All right. I will save it then, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan and I represent the United States in this appeal. I think that Judge McEwen's point about looking at the standard of review is key in this case. The standard of review is that the evidence must be looked in the light most favorable to the government. And the points that Ms. Bogales has made were made in court at the defense, or could have been made, and they were rejected by the jury, who considered the evidence that was presented. And what was this evidence? This evidence was that at the time of his arrest, Mr. Adams was found in possession of a large quantity of cocaine. Officers found over a pound of cocaine in both rock and powder form, worth over $5,000, split up into 100 separate packets suitable for individual sale in his residence, a place that Mr. Adams referred to as one of his two spots, which in drug lingo means a place of drug trafficking activity. Forty-six of those packets were found on his person as he was trying to flee the apartment as the officers came in. The rest of those drugs were found in clothing in his closet. Much of that was found in a tan trench coat stuffed into the back of that closet, which contained his photographic identification. Which, after much investigation and all the resources of the United States government, miraculously nobody found until five years later. It's true, and it was a troubling point, but it was a point that was aired out before the jury. The jury was notified and told that only the DEA agent in preparation for the trial, the Friday prior to the start of trial, found it in a small lapel pocket. That Officer Elmore, who was the state, the San Francisco police officer, had only searched really the two main pockets on the sides of the trench coat. So it was really a question of weight, and it was for the jury to decide, and they did decide. So that trench coat not only had the identification as well as a safe deposit box key, but it also had, in addition to a large amount of cocaine, it had distribution paraphernalia in the form of a sifter, a scale, plastic baggies for packaging the drugs, rubber gloves for keeping fingerprints off, a dust mask for avoiding inhalation of the dust particles. And in the brown leather jacket in the closet were found a larger piece of rock cocaine that might have been a source piece for the packaged cocaine, as well as packaged pieces of cocaine, as well as a bullet. There was also evidence submitted to the jury that, consistent with drug trafficking, Mr. Adams had a large amount of unexplained money, money that allowed him to pay eight months in advance of rent for a hotel room that was an alternative residence, that he had the money to pay for or to purchase or to acquire a Rolex and an Omega watch, which were stolen from that residence in the year 2000, at a time when he was maintaining this alternative residence, that he had the money to simultaneously buy both new kitchen and bedroom sets in 2003. So that was a lot of money. There was a lot of evidence that was consistent with his drug trafficking. The jury considered all of this, and they were able to consider that this was more than sufficient evidence for them to find it to be, to find that Mr. Adams was guilty beyond a reasonable doubt on all three counts. Now, Ms. Bogalas tries to analogize this case to Vasquez Chan and some of these other cases in which the Ninth Circuit has said that mere presence is not sufficient to establish possession with intent to distribute. And it's just not an apt analogy, because there is so much more than mere presence in this case. We don't have a situation as with Vasquez Chan where we're talking about a housekeeper and her guest, nor do we have a situation as in Ramirez, which is another similar case where we have a visitor to a house, a 20-year-old guy who's visiting the house, staying overnight after partying or celebrating his sister's graduation party. We don't have a situation as with Bautista Avila where we have people staying in a motel room that they don't have possession over. Here we have a person who, by his own admission, was at his residence. He said he stayed there. His longtime girlfriend who lived there said he stayed there, testified that he was one of three people who had keys to that place, that he was one of the only people who was in and out of that place on a daily basis. We had the testimony of the landlord, Mr. Grgich, who said that he, Gary, not Chris Adams, not anybody else, he, Gary, as well as Beulah Watley were residences of that apartment. We have indicia that show that he lived in that bedroom, indicia that show that he, letters from him, pictures of him, proof of enrollment from him that were in his nightstand, on the nightstand in the bedroom as well as the closet. We had, moreover, we had evidence showing that trench coat belonged to him because his identification was in there. Both the trench coat and the leather jacket were brought before the jury, Exhibits 19 and Exhibits 20A. The physical pieces of clothing were brought in front of the jury. So they could see very clearly whether those pieces of clothing might not have fit the defendant or whether they did fit the defendant. The defense attorney very well might have asked somebody else to wear that jacket. Beulah Watley testified on the stand. The defense attorney could have said, Ms. Watley, would you please put on this jacket and show that it was hers. The defense attorney didn't. So that time has passed for speculation. The jury had all the evidence that it needed for it to consider. It did consider that, and it came to a conclusion that Mr. Adams was guilty of all three counts that were charged. Under the applicable standard that was articulated in Jackson v. Virginia, the government would submit that this court must affirm. If there are no other questions, I would submit. I think not. Thank you. Thank you. As we've conceded all along, there is certainly evidence here adequate to have arrested Mr. Adams and to have indicted him. The main problem here is that there were many people with access to this apartment. They were not excluded as possible people involved in this possession and the knowledge. There was the daughter who was on parole, and the expert testified that that dust mask was consistent. He didn't say with her, but he said with a person on parole or probation trying to keep their system clear from drug residue for the mandatory testing they have to do. That only could have been the daughter. Three people had keys. That's what I heard counsel just say. Three people had ready daily access to this. Chris Adams went crazy when the police arrived. His consciousness of guilt was obvious and enormous. Gary Adams, on the other hand, was calm and cooperative. The stash apartment? You know, the fact that somebody else might have also been involved in a drug distribution doesn't preclude your client from being found guilty, correct? Well, it does not. But there was no exclude. Even if these other people, well, let me put it this way. There were too many possibilities that it was someone else for this to have been proven beyond a reasonable doubt. And I understand that the court takes this. Well, did they find the daughter with 46 packages of cocaine in her pocket? The daughter was not there. Correct. Did they find anyone else with possession on their person? Don't you think that provides a link here that puts him in a different posture than the other possibilities? I don't think so. And the reason I don't think so is because the drugs that were in his pocket were of an entirely different consistency, a significantly basic consistency. The caffeine additive that was in everything in the closet was not in what he had on his person. The source was different. That was clear. He was calm. He was cooperative. His statements indicated that whatever was in the closet belonged to his brother. Nothing linked him to that, to the drugs in that closet other than the fact that he was present in the apartment, that he resided there with other people, many other people who had access exactly to that spot. The jacket was hidden and stashed in the back. The ID card was not found for years, and there was no adequate explanation given for that. Just it was overlooked. The chain of custody on that jacket was sloppy and incomplete. To have that kind of decision made by the jury was to assume a great deal in the light of many, many unanswered questions. The evidence simply was not. Was there a motion by the defense to exclude the jacket for reasons that it was unreliable evidence and chain of custody couldn't be established? Well, no, and I don't know that you could do that because a chain of evidence, of course, does go to the weight. I understand that. It doesn't make something inadmissible. It simply goes to how credible is it, and are we really going to believe that this was the state it was in at the time this began, at the time it was seized? That's what wasn't established. No, I don't believe there was such a motion made because it probably would have been futile. It was certainly admissible. But it was a case where many, many assumptions were made all along the line, from the officers to the prosecutor and, in the end, to the jurors. Mr. Adams is in prison now for 22 years based on this, when really all that there was was the eight grams in his pocket that could be directly tied to him. So on that basis, we would ask the Court to reverse all the counts. Thanks to both counsel for your argument this morning. Case of the United States v. Adams is submitted.
judges: Noonan, McKeown, Trager